**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LORA E. THOMPSON,**

     **Plaintiff,**

**vs.**                                                             **CIVIL ACTION NO. 3:20-CV-00280**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

     This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's applications for Child Insurance Benefits (CIB)[1] under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered April 24, 2020 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 12, 13)

     Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for an award of benefits or for remand (ECF No. 12), **GRANT** Defendant's request to affirm the

---

[1] The Regulations provide for payment of disabled child's insurance benefits if the claimant is 18 years old or older and has a disability that began before attaining age 22. See 20 C.F.R. § 350(a)(5).

decision below (ECF No. 13); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the docket of this Court for the reasons stated *infra*.

## Procedural History

The Plaintiff, Lora E. Thompson, (hereinafter referred to as "Claimant"), protectively filed her applications for child insurance benefits and supplemental security income on January 19 and January 12, 2017, respectively, alleging disability since August 15, 2015, because of autism, depression, and "ADD".[2] (Tr. at 21, 243-242, 243-248, 265) Her claims were initially denied on March 28, 2017 (Tr. at 132-136, 137-141) and again upon reconsideration on June 27, 2017 (Tr. at 155-161, 162-168). Thereafter, Claimant filed a written request for hearing on July 7, 2017. (Tr. at 169-171)

An administrative hearing was held on January 9, 2019 before the Honorable Charles Woode, Administrative Law Judge ("ALJ"). (Tr. at 34-79) On February 12, 2019, the ALJ entered an unfavorable decision. (Tr. at 14-33) On March 28, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 239-242) The ALJ's decision became the final decision of the Commissioner on March 26, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-8)

On April 22, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 12), in response, the Commissioner filed a Brief in Support of Defendant's

---

[2] In her Disability Report submitted on January 19, 2017, at the initial level of review, Claimant alleged that she had stopped working as of May 15, 2015 for other reasons, specifically, because "school ended". (Tr. at 265, 270)

Decision (ECF No. 13). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 20 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 19, 42) Claimant did not attend special education classes and graduated high school; she also completed a year of college. (Tr. at 44-45, 271) Since October 2017, Claimant was working in the kitchen at a daycare facility about twenty hours per week and had participated in a work-study program while enrolled in community college during the 2014-2015 school year. (Tr. at 19, 45-46)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether

the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings

and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant had not attained the age of 22 as of August 15, 2015, the alleged onset date. (Tr. at 19, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: hip dysplasia; attention deficit hyperactivity disorder; depression; obesity; and autism spectrum disorder. (Tr. at 20, Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except the claimant can occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, and operate push of [sic] pull controls with her lower extremities. She is unable to climb ladders, ropes, or scaffolds. She is to avoid concentrated exposure to extreme cold, wetness, vibration, and hazards including unprotected heights and dangerous machinery. She requires the opportunity to sit momentarily after remaining standing for between thirty and sixty minutes. The claimant retains the

6

ability to perform simple, routine, and repetitive tasks in low-stress work environments without fast pace or high production quotas, where "low-stress" is defined as jobs having only occasional decision-making and occasional changes in work setting. She is capable of occasional interactions with coworkers and supervisors, but no contact with the public.

(Tr. at 22, Finding No. 5)

At step four, the ALJ found Claimant has no past relevant work. (Tr. at 27, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Tr. at 27-28, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from August 15, 2015 through the date of the decision. (Tr. at 28, Finding No. 11)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

In support of her appeal, Claimant asserts that the ALJ failed to properly consider the totality of the evidence concerning her mental impairments, and this failure negatively impacted the ALJ's credibility determination, as well as contributed to a flawed RFC assessment. (ECF No. 12 at 5) Claimant points out that the objective findings of the consulting examining psychologist and assessments provided by Claimant's mental health providers support Claimant's allegations, and further, support a finding that Claimant is unable to engage in substantial gainful activity at any exertional level. (<u>Id</u>. at 5-6) Additionally, Claimant's mother's testimony was consistent with the vocational expert's testimony to the extent that Claimant is unemployable. (<u>Id</u>. at 6-7) Claimant requests this Court to reverse and order a reward for benefits, or alternatively, to remand to correct these errors. (<u>Id</u>. at 7)

In response, the Commissioner states that the RFC assessment accurately reflected both

Claimant's exertional and non-exertional impairments and is supported by substantial evidence. (ECF No. 13 at 12-13) Further, the ALJ thoroughly considered the psychological examiner's findings, along with the evidence concerning Claimant's mental health treatment, including the opinions provided by the State agency consultants. (Id. at 14-15) The ALJ's RFC assessment also accounted for Claimant's physical and mental impairments, and explained the restrictions to light work with routine and simple tasks in a low-stress environment by referring to specific evidence in the record. (Id.)

With respect to Claimant's subjective complaints, the ALJ appropriately determined that they were inconsistent with the objective medical evidence and other evidence of record, including Claimant's own statements and work history, which did not support Claimant's allegations of being totally disabled. (Id. at 16-18) The ALJ's thorough explanation for his findings concerning Claimant's subjective complaints complied with the Regulations and should not be disturbed. (Id.)

The ALJ also appropriately considered Claimant's mother's testimony, albeit duplicative of Claimant's, however, the ALJ's determination that the evidence simply did not support a finding of disability was well-supported notwithstanding Claimant's mother's lay opinion. (Id. at 18-20) To the extent that Claimant's mother's testimony was consistent with the vocational expert's concerning Claimant's being off-task to the point of unemployability, the ALJ is under no obligation to accept opinions concerning limitations that are ultimately not adopted. (Id. at 20)

In sum, the Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm. (Id.)

**The Relevant Evidence of Record**[3]

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Evidence Related to Mental Health Treatment:

On September 1, 2015, Claimant underwent a psychological evaluation with Karen S. Roper, Ph.D., and Tracy Legrow, Psy.D. (Tr. at 385-394). Drs. Roper and Legrow noted that although Claimant was academically successful in a small private high school, she was on academic probation at Marshall University (Id. at 385). A previous assessment documented that Claimant repeated first grade; however, she did not receive special education services, though her mother reported extensive one-on-one help with extended time for assignments (Id.). Claimant found college lectures overwhelming and experienced difficulty in comprehending conversation, and was unable to take adequate notes due to slowed processing time (Id.).

On examination, Claimant had a clumsy communication style; was pleasant, but had occasional oppositional style with family; adequate hygiene and grooming; good memory; and some disruption in cognition and executive functioning (Tr. at 386). Drs. Rogers and Legrow administered intelligence testing, and Claimant's subsets were within the average range with the exception of digit span (a measure of short-term auditory memory and attention) (Tr. at 388). Claimant received a low score in adaptive functioning and very low ratings in receptive, expressive, and written language skills (Tr. at 388-389). Although she had limited social interactions, she seemed content with peer interactions (Tr. at 388). Claimant's social behavior supported an autism diagnosis (Tr. at 389-390).

Drs. Roper and Legrow assessed Claimant with mild major depressive disorder and level II autism with expressive language impairments but without intellectual disability (Tr. at 392).

Drs. Roper and Legrow suggested, among other things, social skills training, possible speech therapy, an individualized educational plan, and continued medication, which had already proven to advance her reciprocal communication (Tr. at 392-394).

Claimant saw Dr. Roper regularly between September 2015 and June 2017 (Tr. at 496-604). Claimant had odd and eccentric speech with word finding difficulty; minute echolalia that did not interfere with communication or concentration; extended response time; lack of conceptual sophistication; and repetitive behavior or parroting of phrases (Tr. at 497, 500, 503, 505, 508, 511, 514, 517, 520, 526, 529, 532, 534, 537, 541, 544, 548, 551, 554, 557, 560, 566, 579, 582, 584, 587, 590, 593-594, 596, 600, 603). Examinations frequently showed that Claimant was cooperative and calm with pleasant behavior; had good eye contact and impulse control; had logical and goal directed thought process; displayed a euthymic mood and congruent affect; denied depression, helplessness, guilt, or self blame; had intact memory and concentration; and had fair judgment but limited insight into the nature of her illness (Tr. at 500, 503, 505, 514, 517, 519-20, 523, 529, 531-32, 534, 537, 539, 541, 544, 548, 557, 563, 566, 579, 582, 587, 590, 592-593, 597, 600, 603; but see Tr. at 497, 508, 511, 526, 551, 554, 560, 584, 594). Dr. Roper noted that when Claimant stayed compliant with medication and good environmental structure, she was productive and engaged with a clear mental status (Tr. at 559). Without medication, she was overwhelmed and angry/depressed (Id.). On one occasion, Claimant attributed improved functioning to consistent medication and improved sleep (Tr. at 499).

From late 2015 to 2016, Claimant attended community college and at times commuted by bus independently (Tr. at 519, 528, 531, 533, 536, 550, 557, 565, 581). Claimant also was matched with a helper from Autism Services, who would spend time with her and run errands; spent time

with friends and a new girlfriend; and attended fall-themed events (Tr. at 407, 507, 513, 522, 538, 541, 544, 557). In February 2017, Claimant reported wanting to sell baked goods at her mother's shop (Tr. at 504, 507). Claimant's mother and the Autism Services helper planned to support her and assist with finances and shopping (Tr. at 504). One month later, Claimant agreed to guardianship by her mother, but also expressed a desire for increased independence (Tr. at 502).

In March 2017, Claimant established care with primary care physician William Nitardy, M.D. (Tr. at 419-423). In addition to her physical complaints, (see *infra*) Claimant was recently diagnosed with autism spectrum disorder, although she had exhibited symptoms for many years (Tr. at 419). Claimant reported that her attention deficit hyperactivity disorder ("ADHD") was well controlled, and she took an increased dose of her mother's medication for depression, with some symptom improvement (Id.). On examination, Claimant had a normal mood and affect (Tr. at 422). Her ADHD was better on medication, and she was told to continue the dosage (Tr. at 423).

In May and June 2017, Claimant reported selling treats and receiving two cake orders; she was working on "expanding her culinary repertoire" (Tr. at 496, 499). With medication, Claimant reported that "she feels better now than ever before." (Tr. at 499).

Beginning in May 2017, Claimant also received medication management with nurse practitioner Stacy Sheppard after a referral from Autism Services (Tr. at 440). Claimant's mother felt she was doing well, but had regressed since tenth grade (Id.). Claimant also reported feeling overwhelmed around many people and had some ritualistic behaviors and trouble with change (Id.). An examination revealed she was fully oriented with an adequate fund of knowledge, normal speech, euthymic mood and normal affect, intact insight, and unimpaired judgment (Tr. at 443). Ms. Sheppard prescribed Prozac (Tr. at 444). Claimant returned to Ms. Sheppard between June

and August 2017 when it was noted that Claimant's mental status examinations remained essentially the same (Tr. at 607, 611). Claimant's mother noted that when Claimant took her Adderall, her focus and attention were much improved (Tr. at 605). Claimant was still trying to start her own bakery business (Tr. at 606, 610). By late August 2017, Claimant reported that she had been hired for a part-time position at a daycare (Tr. at 609). She was working eight hours per day, once or twice per week (Id.).

In December 2017, Claimant's mother called Dr. Nitardy for a refill of Adderall (Tr. at 448). However, Claimant needed to come in for an appointment as she had not been seen since March (Id.). The next month, Claimant followed up with Dr. Nitardy (Tr. at 454). Claimant reported that she had started a job at a local childcare facility and had no work issues, despite being off treatment for ADHD (Id.). She had no problems with authority or staying on task, despite an occasional argument with her mother and younger sister (Id.). Her mood was well-controlled off medication, and she did not seem to be excessively worrying (Id.). Claimant was able to complete work without significant issue despite her autism and anxiety/depression, but Dr. Nitardy noted that she would be best served with treatment by a psychiatrist (Tr. at 451).

Eight months later, in April 2018, Claimant had a case management visit with Autism Services; she needed transportation to and from her job while her mother was away (Tr. at 379). She was not taking her prescribed medication but was doing well and enjoying work (Id.). At an August 2018 appointment with Dr. Nitardy, Claimant admitted not following up with a psychiatrist and that she did not like taking medication (Tr. at 468). She acknowledged a lower mood but denied any difficulties with work or changes in memory (Id.). Dr. Nitardy recommended that Claimant restart her medication and follow up with counseling (Tr. at 464).

12

Claimant's Autism Services case manager visited three more times in 2018 (Tr. at 373-375, 377). In September, Claimant reported quitting Prozac due to headaches but wanted to begin a driver's program (Tr. at 351, 373-374). At an IEP the same month, Claimant also expressed interest in gaining independence (Tr. at 351). Although they discussed her work schedule, Claimant's mother had reapplied for Social Security benefits as Claimant's father's insurance was no longer covering her psychiatric and psychological care (Tr. at 351, 359). In November/December 2018, Claimant was working more hours at the daycare and enjoyed her job (Tr. at 375, 377). She was still not taking Prozac because she reported it gave her headaches (Id.). Claimant's mother also expressed concern that Claimant's high level of functioning would prevent her from obtaining Social Security benefits (Tr. at 377).

Consultative Psychological Examiner's Report:

Claimant attended a consultative examination with psychologist Angela Null, M.S., on March 7, 2017 (Tr. at 424-428). Claimant reported applying for disability because "it's really hard to get hired. I have applied for jobs but I don't have experience" (Tr. at 425). She alleged limitations due to hip issues and that autism made it overwhelming to be around a lot of people (Id.).

On examination, Claimant presented with an awkward gait and excessive fidgeting and was mildly disheveled (Tr. at 424, 426). She displayed varied eye contact and an odd tone of voice but was polite and cooperative (Tr. at 426). She was fully alert and oriented; exhibited a mildly anxious mood and mildly constricted affect; had connected thought processes; had intact judgment, memory, and concentration; and worked at a normal pace although she demonstrated moderate deficits in social functioning (Tr. at 426-427). Claimant told Ms. Null that she ran errands twice

13

weekly with her autism worker, attended movies, walked in the park, dined out with her family regularly, baked, drew, read, socialized with three close friends, and did some housework (Tr. at 427-428). She did not enjoy vacations as they disrupted her routine and rarely grocery shopped (Tr. at 427). Claimant reported managing her finances independently in the past (Id.). Ms. Null diagnosed autism spectrum disorder, ADHD, and major depressive disorder (Id.).

Status Agency Psychological Opinion Evidence:

In March 2017, state agency psychologist Jeff Boggess, Ph.D., reviewed the record and opined that Claimant could perform work with limited contact with the general public and co-workers in a work-like setting (Tr. at 90, 100). In June 2017, state agency psychologist G. David Allen, Ph.D., reviewed the updated record and agreed with Dr. Boggess that, functionally, Claimant only had social limitations (Tr. at 123-124, 127).

Evidence Related to Physical Health Treatment:

In June, July, and August 2016, Claimant treated at Marshall Orthopedics for hip pain (Tr. at 396-409). She had tenderness at the greater trochanter at one appointment but otherwise displayed 5/5 strength, negative straight leg test, good tone, no atrophy, and a normal gait,  but she preferred a broad based stance for balance (Tr. at 397, 404, 407). She had some range of motion limitations in external hip rotation (Id.). Pelvic and lumbar spine x-rays were normal, and an MRI was completely negative (Tr. at 400, 404-405, 695). Her physician felt she would benefit from physical therapy "more than anything" (Tr. at 407; see also Tr. at 398, 404-405).

Claimant also treated for her physical complaints with primary care physician Dr. Nitardy in March 2017 (Tr. at 419). On examination, she displayed a normal gait, station, strength, and tone (Tr. at 423). She was told to increase activity for hip pain (Id.). Two months later, in May

2017, Claimant visited the emergency room for right hip pain following a fall (Tr. at 485). Although Claimant had some limitations on range of motion and point tenderness, she had 5/5 strength, no focal deficits, and a negative straight leg raising test (Tr. at 487). Diagnostic tests of the lumbar spine and right hip yielded unremarkable findings (Tr. at 487-488, 490-491).

Eight months later, in January 2018, Claimant saw Dr. Nitardy for somewhat increased right-sided hip pain (Tr. at 451, 454). An examination showed normal gait and station and intact strength with some decreased range of motion of the right hip without laxity (Id.). A hip x-ray showed no abnormal findings (Tr. at 457, 617). She was referred for physical therapy (Tr. at 451).

Claimant returned to Dr. Nitardy in April 2018 for transient abdominal pain, at which time her gait, strength, and muscle tone were normal (Tr. at 459, 461). Four months later, Claimant reported a recent fall (Tr. at 468, 650). However, an examination revealed normal strength and tone, and Dr. Nitardy felt her falls were of an unclear etiology (Tr. at 464, 652). He prescribed physical therapy (Id.). Dr. Nitardy also completed a statement confirming that Claimant was physically fit for employment in a facility caring for children (Tr. at 462). There is no evidence that Claimant followed up with the multiple referrals for physical therapy.

   State Agency Medical Opinion Evidence:

In March 2017, state agency physician Amy Wirts, M.D., reviewed the record and opined that despite her hip pain, Claimant had no exertional limitations; could occasionally climb ladders, ropes or scaffolds, but frequently perform other postural activities; and should avoid concentrated exposure to vibration and hazards (Tr. at 88-89, 98-99). In June 2017, state agency physician Dominic Gaziano, M.D., agreed (Tr. at 113-114, 125-126).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she was unable to work due to issues with her hips and because she could not be around people for a long period of time (Tr. at 47). She testified that she took no medications on a regular basis. (Id.) Claimant also stated that she doesn't handle stress or changes in routine well; had a hard time with college because she wasn't doing the same thing every day; self-soothes by rocking; locks herself away if she's around people for too long; and afraid of driving due to slow reaction time (Tr. at 50, 52-54; see also Tr. at 289, 311). She lives with her family and meets with Autism Services twice per week to grocery shop and hang out (Tr. at 44, 53; see also Tr. at 286). Claimant works at a daycare; enjoys baking; goes to the movies; watches television; uses her phone; plays computer games; microwaves meals; and does simple chores (Tr. at 51, 55-56; see also Tr. at 285, 309).

Felicia Beatty, Claimant's Mother's Testimony:

Ms. Beatty testified that Claimant requires a lot of assistance and reassurance and is incapable of living independently (Tr. at 58). She admitted that Claimant is high functioning and able to read and perform basic math but described her as childlike, has poor motor skills and unable to problem-solve adult issues (Tr. at 59). She acknowledged that Claimant did relatively well in high school but had difficulty at college because it was not just following instructions (Tr. at 65). She also described slowed reflexes, a low threshold for stimulation, and difficulty with change, insisting upon routine and sameness (Tr. at 68-71).

Vocational Expert ("VE") Testimony:

In response to hypothetical questions, including one where an individual of Claimant's vocational profile could perform the range of light, low stress, low contact, simple work, *supra*,

the VE testified that such an individual could perform the representative light, unskilled jobs of cleaner, housekeeper, silver wrapper, and shirt presser (Tr. at 76). However, should the individual be off task more than 20 percent of the workday and miss more than three days of work a month, the individual would be unable to do any work in the national economy (Tr. at 78).

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

<u>The Mental Health Evidence:</u>

Claimant complains that the ALJ "fail[ed] to give proper consideration to the medical evidence of record regarding [Claimant's] mental impairments", and refers to the findings and diagnoses provided by Ms. Null, Dr. Roper and Dr. Legrow, as this evidence was "vocationally significant", thus suggesting Claimant's mental impairments were disabling. (ECF No. 12 at 5-6) As a practical matter, it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's mental RFC assessment; per 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations further state that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." Id. §§ 404.1527(b), 416.927(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. §§ 404.1527(c), 416.927(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "***residual functional capacity . . . or the application of vocational factors***" are determinations reserved solely to the Commissioner. Id. §§ 404.1527(d)(2), 416.927(d)(2) (***emphasis*** added). To that

extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. §§ 404.1527(d)(3), 416.927(d)(3).

While it is important to recognize that Ms. Null and Drs. Roper and Legrow did not provide a "medical opinion" concerning what Claimant could still do despite her limitations or mental restrictions in accordance with the Regulations' definition, Claimant's focus on the ALJ's failure to "proper[ly] consider[]" this evidence, thus negatively impacting his credibility determination and RFC assessment, is of no merit: in his review of the objective evidence, the ALJ expressly considered the lengthy medical records from Dr. Roper, beginning with the evaluation on September 1, 2015 when Claimant was placed on academic probation while attending Marshall University, detailed *supra* and including numerous visits throughout 2016 and 2017 (Tr. at 24-25, 384-394, 440, 496-604, 605-612, 368-380, 348-367) The ALJ next thoroughly reviewed the consultative examination findings provided by Ms. Null, detailed *supra*. (Tr. at 25-26, 424-429) In short, the undersigned not only **FINDS** that the ALJ properly considered the evidence supplied by Ms. Null and Drs. Roper and Legrow, but also considered it in light of the overall evidence of record, discussed *infra*. In any event, even if these providers did render an opinion relating to Claimant's functional capabilities, as stated *supra*, the Regulations do not require an ALJ to give any special deference to such opinions.

Evaluation of Symptoms in Disability Claims:

Claimant conclusively asserts that "[i]t is clear that the [ALJ] did not fairly and reasonably evaluate the [Claimant's] credibility in light of the medical evidence of record considered in its totality." (ECF No. 12 at 6)

Social Security Ruling ("SSR") 16-3p[4] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to

---

[4] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. §§ 404.1529(c)(3), 416.929(c)(3).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

Earlier in the written decision, the ALJ determined that the evidence of record pertaining to Claimant's mental impairments only caused her moderate limitations in the four functional areas, described *supra*:

In understanding, remembering, or applying information, the ALJ referred to Claimant's Individualized Education Plan ("IEP") and documentation from Autism Services Center, noting that Claimant was independent in attending her personal needs, that she assisted with household tasks, and worked on a part-time basis (Tr. at 21, 368-380, 348-367). Although he recognized that Claimant had an IEP meeting while in college in 2018, the ALJ noted that the record showed that Claimant did not receive special education services in primary or high school, and that Claimant's mother testified that she did well in high school due to the regimented schedule and repetition (Tr. at 21, 384-394, 348-367). Similarly, in interacting with others, the ALJ considered the evidence that Claimant gets nervous around others, requires reassurance, and is easily overstimulated, however, the evidence also showed that she has friends. (Tr. at 21) In concentrating, persisting, or maintaining pace, the ALJ acknowledged that Claimant had been monitored and periodically medicated for ADHD, "with reportedly impaired concentration", however, he also noted that Claimant did not testify or report to the SSA any difficulties in concentration that would impair her abilities to attend to such tasks in the work setting. (Tr. at 21, 384-394) Finally, with regard to adapting or managing oneself, the ALJ considered the evidence that Claimant was uncomfortable learning to drive due to her slow processing speed and that the testimony indicated Claimant has difficulty with adult problem solving, and tended to be childlike. (Tr. at 21) However, the ALJ also considered the fact that Claimant managed her bank account, completed high school without special education services and had worked part-time in a kitchen setting since October 2017; the

ALJ again underscored that both Claimant and her mother indicated Claimant preferred repetitive tasks and predictable situations. (Tr. at 21, 301-312, 368-380, 348-367, 424-429)

In addition to Claimant's and her mother's testimonies (Tr. at 23), *supra*, as well as Claimant's allegations in her disability reports (Tr. at 23, 264-278, 293-300, 301-312), the ALJ also considered the objective medical evidence (Tr. at 24-26), *supra*. Following his discussion of the medical evidence, the ALJ then discussed the other evidence of record in his analysis under SSR 16-3p and concluded that Claimant's treatment record "does not lend support to assertions of disabling conditions." (Tr. at 26)

Besides recognizing that imaging of her hip condition "consistently yielded unremarkable results", the ALJ highlighted significant aspects with respect to Claimant's mental health treatment that failed to support her allegations of disabling conditions: the autism spectrum disorder assessment after she experienced academic difficulties while enrolled at college (Tr. at 26, 384-394); Claimant's decision to discontinue stimulant and antidepressant medication "without any identified consequences" (Tr. at 26, 383, 368-380, 348-367); Claimant's strides in gaining independence, including part-time work and starting driver's education (Tr. at 26, 368-380); and "[p]er available evidence, the claimant's mother expressed concerns in late December 2018 that the claimant's high level of functioning would prevent her from obtaining Social Security benefits" (Tr. at 26, 377).

The ALJ also acknowledged that Claimant "not only cares for her own personal needs, but also prepares simple meals, performs simple chores, shops for necessities, socializes with friends on social media and in person, and enjoys baking" (Tr. at 26, 301-312), plus, it was noted that Claimant worked at a daycare facility since October 2017 and "enjoyed her job" (Tr. at 26, 368-

380, 348-367). In addition to starting a driver's education program and expressing a desire to become more independent, the ALJ concluded that this "range of daily living activities is inconsistent with disabling conditions." (Tr. at 26) Moreover, the ALJ considered Claimant's work history, determining that this also failed to support her allegations of disabling conditions, noting that she had been employed part-time since October 2017, and that she had previously worked in a clerical position in a temporary work-study program that had ended for reasons unrelated to her alleged impairments (Tr. at 26, 301-312, 424-429). The ALJ also noted that during the March 2017 consultative examination Claimant stated she was applying for SSA benefits because " ' it's really hard to get hired. I have applied for jobs but I don't have experience.' " (Tr. at 26, 425) On the heels of this observation, the ALJ specifically cited:

> Agency regulations state that a claimant is not disabled if the residual functional capacity and vocational abilities make it possible for her to do work existing in the national economy. Other factors affecting unemployment, including an inability to secure employment, lack of work in the local area, hiring practices of employers, technological changes in the claimant's last industry, cyclical economic conditions, lack of job openings, the fact that the claimant would not actually [b]e hired to do work he could otherwise do, or that the claimant does not wish to do a particular type of work are all irrelevant to the sequential analysis (20 C.F.R. 416.966)

(Tr. at 26-27)

In sum, the ALJ thoroughly considered the medical and other evidence of record and provided a reasonable explanation for why he found Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the record, and that the analysis complies with SSR 16-3p and the Regulations. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's symptoms is supported by substantial evidence.

The Mental RFC Assessment:

As noted *supra*, the Regulations' definition of a "medical opinion" mirrors an RFC assessment. A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In addition to the objective medical evidence, Claimant's and her mother's testimonies, and other evidence of record, the ALJ advised that the mental RFC assessment was "based in part" on the opinion provided by state agency consultant, Dr. Allen, who opined that Claimant "remained able to perform tasks in environments with interpersonal limitations despite" her mental impairments' symptomologies (Tr. at 27, 106-117, 118-129). However, the ALJ further limited Claimant to simple, routine, and repetitive tasks in low stress environments because he recognized there was evidence of record describing impaired processing speed and attention. (Tr. at 27, 424-429, 384-394, 368-380) Although the ALJ acknowledged Claimant's mental impairments were severe (Tr. at 20, 27), he ultimately determined that the evidence did not show that these impairments caused significant functional deficits that would have precluded employment. (Tr. at

27) Indeed, in addition to accommodating Claimant's hip condition "despite a lack of compliance with recommended treatment, by limiting her to light exertional level work", the ALJ restricted Claimant "to simple, routine, and repetitive tasks in low-stress work environments with interpersonal limitations in order to accommodate [her mental impairments]". (Id.) Accordingly, the undersigned **FINDS** that given the ALJ's discussion of the evidence and the resultant Claimant's mental RFC assessment is also supported by the substantial evidence.

To the extent that Claimant has argued that the ALJ's physical RFC is not supported by substantial evidence ("it is difficult to understand how the [ALJ] concluded that the [Claimant] has the [RFC] to perform work at the light level of exertion" (ECF No. 12 at 6)), the undersigned notes that Claimant provides no further development in support of this argument. Nevertheless, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more than sufficient notations from the record that documented Claimant's subjective complaints related to her physical impairments, which included her hip dysplasia, mild sleep apnea, and obesity (See, Tr. at 20, 24), and compared these with the overall evidence before him. This included the opinion evidence provided by state agency medical consultant Dr. Gaziano, who opined Claimant remained capable of performing work "at all exertional levels" (Tr. at 27, 106-117, 118-129). Significantly, while the ALJ noted that imaging of Claimant's hip yielded nothing remarkable, he recognized that clinical examinations from 2016

and 2018 showed she had decreased range of hip motion (Tr. at 27, 395-409, 451) and that despite "having been referred for physical therapy at multiple points in 2017 and 2018" on which Claimant did not follow through (Tr. at 27, 418-423, 446-479), the ALJ reduced Claimant's exertional level of work with additional postural and environmental limitations. (Tr. at 27)

In sum, the undersigned **FINDS** the RFC assessment with respect to Claimant's physical impairments is supported by substantial evidence.

<u>Fifth Step Finding:</u>

Finally, with respect to Claimant's argument the VE's testimony that Claimant could not sustain any substantial gainful activity if she is off-task more than 20% or absent three or more days of work per month was consistent with Ms. Beatty's testimony (ECF No. 12 at 6-7), suggesting that the ALJ should have therefore adopted same, it is noted that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, the undersigned **FINDS** that the VE's responses to the ALJ's controlling hypothetical question were supported by substantial evidence, and further **FINDS** that the ALJ was entitled to rely upon those responses at the fifth step of the sequential evaluation process. See 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); 404.1566(e), 416.966(e).

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she can work

at light exertional levels for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, including imaging, and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony, and Claimant's mother's testimony; the ALJ's thorough discussion of all this evidence, and his ultimate determination that Claimant remained capable of light work despite her ongoing complaints, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant is not disabled is supported by substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for remand (ECF No. 12), **GRANT** the Defendant's request to affirm the decision below (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules

6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 29, 2020.



Omar J. Aboulhosn
United States Magistrate Judge